UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| UNITED STATES OF AMERICA | ) |
|---|---|
| Plaintiff | ) |
| v. | ) CASE NO. 1:09-CR-15 |
| MARVELL MOORE | ) |
| Defendant. | ) |

OPINION OF DECISION AND ORDER

Before the court is Defendant, Marvell Moore's ("Moore's"), Motion to Suppress, filed on March 26, 2009. An Amended Motion to Suppress was filed on April 13, 2009. An evidentiary hearing relating to the motion was held on April 20, 2009 following which the Court ordered post-hearing briefs. After requesting an extension of time, Moore filed his brief on June 5, 2009 to which the Government responded on June 19, 2009. Moore replied on June 30, 2009. For the following reasons, the Motion to Suppress will be DENIED.

FACTUAL BACKGROUND

On January 28, 2009, a grand jury returned a two count indictment against Moore, alleging in Count 1 that Moore, a previously convicted felon, knowingly possessed a firearm in violation of 18 U.S.C. §922(g)(1). Count 2 is a forfeiture allegation seeking forfeiture of the firearm alleged to be unlawfully possessed in Count 1. The indictment followed from the execution of an arrest warrant for Moore and the subsequent search of his residence. The present motion to suppress relates to the search with Moore arguing that the search, which officers testified was conducted as a protective sweep of Moore's residence, violated the Fourth Amendment.

1

On September 16, 2008, officers with the Allen County Police Department were attempting to locate Moore and serve an outstanding arrest warrant from the Allen County Superior Court for failing to appear for a scheduled court hearing on a domestic battery charge. (Supp Hrg. Tr., p. 5). Officers received information that Moore was living at Centlivre Apartments # 206, on Westbrook Drive in Fort Wayne, Indiana. (Supp Hrg. Tr., p. 5). However, when officers arrived at that apartment, there was no answer. Thereafter, an individual in the parking lot of the apartment complex directed officers to apartment 111. (Supp Hrg. Tr., p. 6). Officers Scott Borton and Daniel Reed(hereinafter "Officer Reed" and "Officer Borton") knocked on the front door of apartment 111. At that time the peephole in the door fell to the floor. (Supp Hrg. Tr., p. 7). A male voice inside the apartment answered, "What?" (Supp Hrg. Tr., p. 8). Officer Reed identified himself as being with the Allen County Police Department and told Moore to open the door. The male voice told officers to hold on a minute. After waiting 2 - 3 minutes, Officer Reed knocked on the door again.

Through the hole in the door left by the peephole, Officer Reed could see a male black walking toward the door. The individual then walked away from the door and down a hallway to the right. Officer Reed again identified himself as being with the Allen County Police Department and again told Moore to answer the door. At this time, Officer Reed heard a lot of movement coming from the right side of the apartment. Again, Officers directed Moore to open the door. When the door finally opened, officers were able to identify Moore as the individual at the door and the same individual that had approached the door when officers first arrived. (Supp Hrg. Tr., p. 8-9).

Officers Reed and Borton entered the apartment and put Moore in handcuffs. (Supp Hrg. Tr., p. 11). Moore was then asked if there was anyone else in the apartment. Moore told officers

that he and his girlfriend were the only people in the apartment. (Supp Hrg. Tr., p. 14). Moore did not resist the officers as they executed the arrest warrant. At this time, Officer Eric Windom arrived and took control of Moore and his girlfriend. Officers Reed and Borton then proceeded to make a visual inspection of the apartment to ensure that there were no other people present. (Supp Hrg. Tr., p. 15-16).[1]

Officers Reed and Borton immediately turned to the right and went down the short hallway where the noise had come from. (Supp Hrg. Tr., p. 16: (Officer Reed: "I immediately went to my right which is where I had seen Mr. Moore..."). Officer Reed first looked in the bathroom. There was no one in the bathroom. Officer Reed then turned to the left where there was an open bedroom door. (Supp Hrg. Tr., p. 16). Along the wall in the bedroom were two open bifold closet doors. Officer Reed made a visual inspection of the closet using a flashlight and saw no one in the closet. (Supp Hrg. Tr., p. 24). He further stated that he was satisfied that there were no persons in the closet "that could be an immediate threat to me." (Supp. Hrg. Tr., p. 52). Officer Borton was immediately behind Officer Reed during the sweep of the bathroom and bedroom. (Supp Hrg. Tr., p. 22).

Officer Reed testified that normal procedure for a protective sweep is that officers work in groups of two; the first person to enter the room goes to the farthest corner of the room while the second individual into the room makes a more detailed inspection. (Supp Hrg. Tr., p. 22-23, 25). Officer Reed testified that he saw the open bi-fold closet doors, shined his flashlight through the closet, and saw no one that would pose an immediate threat to him as he walked by the closet. (Supp

---

[1] The Government makes much of the fact that in plain view on a table inside the apartment was a marijuana pipe (Supp. Hrg. Tr., p. 14). However, Officer Reed testified at the hearing that he did not see the marijuana pipe "immediately." Further, in response to questions from the Court, Officer Reed testified that while the pipe was in plain view, "it didn't register with him" until after he conducted the protective sweep. (Supp. Hrg. Tr., p. 20). Officer Borton testified similarly.

3

Hrg. Tr., p. 24) Officer Reed kept moving toward the corner of the bedroom. There was no conversation between Officer Reed and Officer Borton as to whether the room was clear or whether Officer Borton was going to continue to search. (Supp Hrg. Tr., p.55).

Officer Borton testified that it was his job to cover Officer Reed as he made his way past the closet to the other side of the room. (Supp Hrg. Tr., p. 78). Following immediately behind Officer Reed, Officer Borton further testified that he saw Officer Reed perform only a quick scan of the closet and he could have missed someone standing in the corner of the closet since he was going by quickly (Supp Hrg. Tr., p. 79). In his experience, individuals hiding in the closet do not routinely stand in the middle of the closet; rather, they often hide in the "recesses" of the closet. (Supp. Hrg. Tr. p. 79). Officer Borton testified that he scanned one corner of the closet, and as he was scanning across to the other side of the closet he saw marijuana leaves on an eye level shelf in the closet. (Supp Hrg. Tr., p. 80). Officer Borton then went to the other corner of the closet and then saw the shoes on the floor of the closet. (Supp Hrg. Tr., p. 84). He also testified that he saw the shoes as he was standing in the closet since they were all lined up on the floor. (Supp Hrg. Tr., p. 83), and that he saw them as he scanned through the closet. (Supp Hrg. Tr., p. 81) Officer Borton noticed in plain view a clear plastic baggy sticking out of one of the shoes. He also noticed the butt of a gun sticking out of another pair of shoes. There was a magazine for a gun in one shoe, a scale in another shoe, and a plastic baggy containing a white rock-like substance consistent with crack cocaine in another shoe. All of the shoes were in a row on the floor. Officer Borton also testified that he did not have to move, shift, or alter anything in the closet in order to see the shoes on the floor or to make his observations about the shoes. (Supp Hrg. Tr., p. 81).

## **DISCUSSION**

The Fourth Amendment to the Constitution of the United States prevents the Government from conducting unreasonable searches and seizures. U.S. Const. Amend. IV.; *United States v. Arvizu*, 534 U.S. 266, 273 (2002). As part of this protection, a search without a warrant is per se unreasonable unless the search falls within one of the established exceptions to the warrant requirement. One exception to the Fourth Amendment's warrantless search prohibition, and the justification used by the officers to conduct their search in the present case, is a protective sweep, first described in *Maryland v. Buie,* 494 U.S. 325, 331 (1990).

Under the protective sweep exception, officers may, incident to arrest and "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.* at 334, 110 S.Ct. 1093. A search beyond those parameters is justified when there are "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.*; *Leaf v. Shelnutt,* 400 F.3d 1070, 1086 (7th Cir.2005). It is important to note that a protective sweep is "not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found." *Buie,* 494 U.S. at 335, 110 S.Ct. 1093; *Leaf,* 400 F.3d at 1086. The justification for a protective sweep is to protect "the safety of police officers, who have an interest in ensuring their safety when they lawfully enter a house. That interest justifies their ensuring that the dwelling does not harbor another person who is dangerous and who unexpectedly could launch an attack." *Leaf,* 400 F.3d at 1087 (alteration omitted) (internal quotation marks omitted). However, whether a protective sweep is reasonable is a fact specific inquiry. *Leaf,* 400 F.3d at 1087; *United States v. Burrows,* 48 F.3d 1011, 1016 (7th

Cir. 1995) (stating that the inquiry is very fact specific and requires that the circumstances of a particular encounter be assessed carefully in light of the overarching policy concerns articulated in *Buie* and other cases recognizes exceptions to the warrant requirement when officer safety is at risk).

*Buie* authorizes two types of protective sweeps as searches incident to arrest. The first type allows officers to look in closets or spaces immediately adjoining the place of arrest "as a precautionary matter and without probable cause or reasonable suspicion." *Buie*, 494 U.S. at 334. A more pervasive search may be undertaken where there are "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* However, "the sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Buie*. 494 U.S. 335-336.

The officers in this case arrived at Moore's residence to serve an arrest warrant on a misdemeanor. Both officers testified that while it took Moore several minutes to respond to the knock on the door, he eventually answered the door and was placed under arrest without incident. However, the officers further testified that they heard "movement" coming from the back of the house prior to Moore opening the door and that Moore had approached the door from the back of the house, returned there and then came back and answered the door.

Given the above facts, there is little question (and the Defendant concedes the point) that the officers had justification to conduct a "cursory inspection" of the areas immediately adjoining the point of arrest. The officers testified credibly that they heard footsteps and other shuffling about in the back bedroom area prior to the defendant answering their door knock. Further, the officers,

6

through the broken peep hole in the door, observed the defendant coming towards the door from the back bedroom area. Nevertheless, the Defendant asserts that the scope of the search, mainly the secondary search of the closet by Officer Borton, falls outside the protective sweep doctrine.

As the Defendant points out in his brief, there are some facts relating to the search that raise an eyebrow or two. The Defendant argues that he was neither combative nor resisting arrest; he was not known to officers to be a dangerous felon when they arrived, and the arrest warrant was for a misdemeanor offense. Thus, he asserts, nothing from the nature of the arrest warrant or from anything that occurred on the scene created a suspicion by the officers that other individuals posing a danger to them were inside the house.

Second, Moore contends that the police in this case "had their man" so to speak. Moore argues that he was in handcuffs and could have been removed from the house immediately and the officers safely on their way, thereby completing the arrest without a protective sweep of the premises. However, even if the arresting officers could have left after they cuffed him, they would have been entitled to sweep the areas adjoining the area of arrest especially since Moore had indicated that his girlfriend was present and it took several additional minutes for her to show herself. *See, e.g., United States v. Robinson,* 775 F.Supp. 231, 234-35 (N.D.Ill.1991) (holding that even though sweep may last no longer than it takes to complete the arrest and depart the premises, officers are not required to surreptitiously back out of a building, guns drawn, pointing in all directions); *see also Burrows,* 48 F.3d at 1017 n. 9 (noting that an "unknown assailant who attacks officers departing from an arrestee's home poses an equivalent, if not greater, risk to the safety of officers and others as does the assailant who attacks the officers upon entry"); *United States v. Brookshire,* 2009 WL 57530 (N.D.Ind. January 8, 2009) ("even if the arresting officers could have

7

left at this time, they would have been entitled to sweep the areas adjoining the hallway as they waited for the Defendant to put his pants on and made their departure from the home, as the arrest would not have been complete until they were safely outside the house.").[2]

Finally, even though Moore concedes that the protective sweep was permissible based on the rustling and footsteps the officers heard from the door, Moore argues that Officer Reed's testimony several times over that he made a cursory inspection of the closet and was satisfied that there was no one secreted there who would pose an immediate threat to officer safety is sufficient for the court to conclude that Officer Borton's subsequent scanning of the inside of the closet is beyond the "quick and limited search of the premises" authorized in *Buie.*

This third point by Moore does cause the court some pause. However, after reviewing the facts, the officers' testimony, which the Court found credible, and balancing Moore's right to be free from unwarranted invasions of his personal liberty against the need for law enforcement officers to protect themselves and others, the Court concludes that the search, while on the outer cusp of the type of search authorized by *Buie,* did not violate its general concept. In *Buie,* the Supreme Court weighed the need to ensure officer safety against an individual's reasonable expectation of privacy in the home, noting that "[t]he risk of danger in the context of an arrest in the home is as great as,

---

[2]In fact, courts have found protective sweeps valid even where the arrest occurs outside the house. *See United States v. Zuniga-Salinas,* 952 F.2d 876 (5th Cir.1992) ("Arresting officers have a right to conduct a quick and cursory check of the arrestee's lodging immediately subsequent to arrest even if the arrest is made near the door but outside the lodging where they have reasonable grounds to believe that there are other persons present inside who might present a security risk."); *United States v. Tobin,* 923 F.2d 1506, 1513 (11th Cir.1991) (en banc) (protective sweep of residence upheld where the arrest had been made in the garage);*United States v. Henry,* 48 F.3d 1282, 1284 (D.C.Cir.1995) ("That the police arrested the defendant outside rather than inside his dwelling is relevant to the question of whether they could reasonably fear an attack by someone within it. The officers' exact location, however, does not change the nature of the appropriate inquiry: Did articulable facts exist that would lead a reasonably prudent officer to believe a sweep was required to protect the safety of those on the arrest scene?")

8

if not greater than, it is in an on-the-street or roadside investigatory encounter." *Buie,* 494 U.S. at 333 (relying on *Terry v. Ohio,* 392 U.S. 1, 24-25 (1968), and *Michigan v. Long,* 463 U.S. 1032, 1049-50 (1983)). Here, it is evident in the record that the officers were justified in making a protective sweep of the apartment for their own safety. Moore had made them aware that one individual was in the home and she did emerge; however, there could have been others especially in light of the noises heard outside the door and the length of time it took Moore to answer the door.

To this end, the officers in this case, based upon their training and experience, were working in tandem to conduct the protective sweep. Both officers testified that there is a specific protocol that they undertake when conducting the type of sweep in this case. Officer Reed testified that his responsibility is to enter the room and move to the back corner to cover the other officer from any hidden danger that lurks as he enters the room. On his way to the back corner, Officer Reed testified that he took a look into the closet with his flashlight to make certain there was no one obviously standing there who posed an immediate danger to either himself or Officer Borton and then moved to the back corner of the room so that Officer Borton could enter. Officer Borton's task is then to make a more thorough inspection of the areas where an individual could be secreted and posing a danger to the officers.

As tempting as it is to isolate the conduct of the officers, it is clear from the evidence in the record that they were acting together to conduct the protective sweep and ensure officer safety. Officer Borton testified credibly that he looked into the recesses of the closet because he believed someone could have been secreted there and Officer Reed had only quickly shined his flashlight there. And, the fact remains that all the seized evidence was found in a place where persons could have been hiding. Officer Borton located these items without moving any items or rearranging

9

anything. Rather, he looked into the recesses of the closet to determine whether an individual was hiding there and, while doing so saw the items in plain view. Because he was completing the cursory inspection in search of individuals who may have been hiding in the closet and posing an immediate danger to his safety and the safety of the other officers, the court is hard-pressed to characterize the search as overly intrusive especially in light of the policy interest of ensuring officer safety set forth in *Buie*.[3] Accordingly, the Defendant's Motion to Suppress is DENIED.

Entered: This 4th day of August, 2009

s/ William C. Lee
United States District Court

---

[3] Because the court concludes that the protective sweep did not exceed the limitations in *Buie*, Officer Borton was in a lawful place at the time he viewed the drugs, gun, and ammunition in the closet. These items were in plain view and subject to the Plain View Doctrine set out in *Minnesota v. Dickerson*, 508 U.S. 366 (1993).